UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARY ANN BOUDREAU

V. C.A. No.: 05-154 S

BACOU USA, INC.
and PRUDENTIAL INSURANCE COMPANY

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff through her attorney, Anthony J. Gianfrancesco, Esq. and requests this Court grant her motion for summary judgment. In support thereof, the plaintiff relies on the accompanying memorandum in support of her motion for summary judgment.

Plaintiff,
Mary Ann Boudreau,
By her Attorney,

Anthony J. Gianfrancesco, Esq. (# 2762)
Baluch, Gianfrancesco, Mathieu & Szerlag
155 South Main Street
Suite 101
Providence, Rhode Island 02903
(401) 331-1434
Fax: (401) 351-9653

**CERTIFICATION**

I hereby certify that a copy has been sent to **Michael J. Pisaturo, Esq.**, The Law Office of Michael J. Pisaturo, P.C., 1312 Atwood Avenue, Johnston, Rhode Island 02919 and **William T. Bogaert, Esq. and Carey L. Bertrand, Esq.**, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 155 Federal Street, Boston, Massachusetts 02110, on this 7th day of October, 2005.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MARY ANN BOUDREAU<br>Plaintiff | : | |
| VS. | : | C.A. NO.: 05-154S |
| BACOU USA, INC. and<br>PRUDENTIAL INSURANCE COMPANY<br>Defendant | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Anthony J. Gianfrancesco, Esq. (#12762)
Baluch, Gianfrancesco, Mathieu & Szerlag
155 South Main Street, Suite 100
Providence, Rhode Island 02903
(401) 331-1434
Attorney for Plaintiff

Table of Contents

Jurisdictional Statement.................................................................... 1

Issue Presented for Review.................................................................. 1

Standard of Review......................................................................... 1

Statement of the Case....................................................................... 3

Statement of the Facts...................................................................... 3-

Argument.....................................................................................12

Conclusion...................................................................................16

Table of Authorities........................................................................18

## I. JURISDICTIONAL STATEMENT

The district court's jurisdiction is based upon 28 U.S.C. §1331, as well as 29 U.S.C. §§1132 (e) and (f). Jurisdiction is proper under the ERISA statute because this case concerns a claim for employee welfare benefits provided to plaintiff incident to her employment with Bacou USA, Inc. Mary Ann Boudreau was offered disability insurance as one of her employee benefits under a plan sponsored by Bacou USA, Inc. and administered by Prudential Insurance Company ("Prudential")

The Prudential plan administrator denied plaintiff's claim for Long Term Disability Benefits effective November 1, 2003. Having exhausted all administrative remedies, this litigation ensued.

## II. ISSUE PRESENTED FOR REVIEW

Whether the decision of Prudential Insurance Company denying Mary Ann Boudreau's long term disability benefits was arbitrary and capricious?

## III. STANDARD OF REVIEW

Both parties have filed cross motions for summary judgment. F.R.C.P. 56 (c) states that a party shall be entitled to a summary judgment, "If the pleading, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). Thus, in order for the plaintiff to prevail, plaintiff must prove her entitlement to disability benefits under the plan provisions. Alternatively, in order for the defendant to prevail, the defendant must prove that the plaintiff lacked such entitlement. When deciding a motion for summary judgment, the court must review the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. Mesnic v. General Electric Co.,, 950 F.2d 816, 820 (1st Cir. 1991), cert denied, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed. 2d 586 (1992); Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

Most courts that have considered the question, including the United States District Court for the District of Rhode Island, are consistent. Where an ERISA plan confers discretionary authority upon the plan administrator to determine eligibility for benefits or to construe the terms of the plan, absent evidence of a conflict of interest between the fiduciary plan administrator and the entity which would ultimately pay the claim, ERISA appeals are to reviewed under the "arbitrary and capricious" standard. The administrator's decision is to be upheld as long as it was "rational in light of the plan's provision, as well as reasonable with no abuse of discretion." See Firestone Tire and Rubber Company v. Bruch, et al., 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) and its progeny; See also, Grady v. Paul Revere Insurance, 10 F.Supp.2d 100 (D.R.I.) 1998, citing Coleman v. Metropolitan Life Insurance Co., 919 F.Supp. 573, 581 (D.R.I.) 1996 and Green v. Metropolitan Life Insurance Co., 924 F.Supp. 351, 357 (D.R.I.) 1996 (plan administrator's determination will be overturned only if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law). The First Circuit has agreed. Doyle v. Paul Revere Insurance Co., 144 F.3d 181, 183 (1st Cir. 1998).

However, courts have also held that although "arbitrary and capricious" is the standard of review, that standard must be tempered by the overwhelming fiduciary standard applied to any plan administrator's actions requiring him/her to "act solely in the interest of plan participants and their beneficiaries." Lang v. Long Term Disability Plan of Sponsor Applied Remote Technologies, Inc., 125 F.3d 794, 798 (9th Cir. 1997) (citing 29 U.S.C. §1001(b)). After all, ERISA's underlying aim is to promote and "protect…the interest of participants in their employee benefit plans and their beneficiaries." (citing 29 U.S.C. 1001 (b)). The Lang court refused to grant deference to a plan administrator it believed was not acting in the interest of plan participants when it terminated disability benefits despite evidence of the plaintiff's continued disability. Lang at 798. When a plan fiduciary fails to act "solely in the interest of plan participants and their beneficiaries", courts have tempered the "arbitrary and capricious" standard by applying a sliding scale review, providing a "more penetrating [review] the greater is the suspicion of partiality." Van Boxel v. Journal Company Employee's Pension Trust, 836 F.2d 1048 (1052-3 (7th Cir.

1988). The Van Boxel court even questioned the wisdom and efficacy of employing the deferential "arbitrary and capricious" standard to review ERISA claims.

The First Circuit recently addressed the issue in Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan, _______ F. ___________ (1st Cir. 2004). The Court stated:

> The operative inquiry under arbitrary, capricious or abuse of discretion review is "whether the aggregate evidence, viewed in the light most favorable to the non-moving party could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." Twomey v. Delta Airlines Pension Plan, 328 F.3d 27, 31 (1st Cir. 2003) (citing Leahy v. Raytheon Co., 328 F.3d 11, 18 (1st Cir. 2002)) "A court must proceed to ensure that the decision was not objectively unreasonable in light of the available evident" (Id. at ____).

The Third Circuit has raised a red flag of caution regarding the deference given to plan administrators when it state the following in Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176 (3rd Cir. 1991):

> Plan administrators are not government agencies who are frequently granted deferential review because of their acknowledged expertise. Administrators may be laypersons appointed under the plan, sometimes without any legal, accounting or other training preparing them for their responsible position, often without any expertise in or understanding of the complex problems arising under ERISA, and, as this case demonstrates, little knowledge of the rules of evidence or legal procedures to assist them in fact finding.

Luby at 1183. Thus, the "abuse of discretion" standard must be tempered by common sense and policy considerations.

## IV. STATEMENTS OF THE CASE

Plaintiff, Mary Ann Boudreau, brought this claim for employee welfare benefits pursuant to §502(a)(1)(B) of the ERISA statute (29 U.S.C. §11329(a)(1)(B). Ms. Boudreau was covered under a plan providing employees of Bacou, USA, Inc. with income protection in the event of disability.

## V. STATEMENT OF FACTS

Mary Ann Boudreau was employed as a buyer for Bacou USA, Inc., f/k/a Uvex Safety for nearly twenty years. She suffered from Lyme disease infection as well as other maladies for several years before her last date of employment on April 13, 2000. Ms. Boudreau submitted a Group Disability Insurance

form dated July 31, 2000 to Prudential Insurance Company stating she suffered from fibromyalgia, chronic pain and fatigue, confusion, poor memory. (MAB 0052). She was initially awarded benefits from October 13, 2000 through April 8, 2001. However, by letter dated June 8, 2001, Ms. Boudreau was informed that she was not eligible for Long Term Disability (LTD) benefits (MAB 0089). The reason give was:

> A review of your medical records did not document a change in your chronic conditions. Although you continued to complain of pain and fatigue, there is no evidence your condition was exacerbated to cause you to go out of work. After a thorough evaluation of the above information, we have determined that you do not meet the definition of Total Disability as defined above. Therefore, we are unable to pay benefits.

The letter did not reference any specific medical records or contents, did not contain any analysis or discussions and simply concluded that Ms. Boudreau was not disabled.

The decision denying Ms. Boudreau LTD benefits was appealed by Attorney David Green by letter dated February 14, 2002 (MAB 0100). At that time, he submitted additional medical records (he had previously submitted a copy of a Social Security Administrative Law Judge's decision awarding Ms. Boudreau Social Security disability benefits (MAB 0092)).

> Prudential responded by letter dated April 25, 2002 stating:
> Ms. Boudreau's claims for LTD benefits was disallowed because we determined that the documentation did not support an impairment that would prevent her from performing the duties of her own occupation. Please refer to our letter dated June 8, 2001 for a complete explanation of our decision. (MAB 0108)

The "complete explanation" referred to has been cited above (MAB 0089). There simply was no explanation given in that letter. The April 25, 2002 letter was much more detailed. It commences with:

> We have reviewed all information in file, including documentation received for the purpose of Ms. Boudreau's appeal, and have determined the medical documentation does not reflect a sickness or injury that would render Ms. Boudreau Totally Disabled from performing the duties of her own occupation which is considered sedentary.

> However, the SOAP Notes dated February 8, 2001 (MAB 0470) clearly state:
> 50yo F. Buyer, oow since 4/13/00 DX:Fibromyalgia, CFS, Major Depression, rec. mod., Pain Disorder associated with psychological factors and a general medical condition. Dr. Auchobon first began tx on 11/7/99 although Dr. Auchobon gives dx of major depression, it appears the chief complaint was pain with a secondary depression. The symptomatology stated on his completed form ie. stress, poor concentration, tearfulness, short term memory impairment can be attributed to pain. It is not clear what type of psychotherapy/goals/ objectives are provided. He does not state the nature and severity of symptoms. The medication regimen does not support tx for a major depression, but appears she is being tx for a secondary, chronic depression. Dr. Auchobon seems to be advocating for permanent disability and his notes are

unavailable due to legibility. May need IME to clarify severity of depression, level of functioning, tx recommendations.

In addition, the statement that Ms. Boudreau's job duties were sedentary in nature is not substantiated by the record. Her job summary included responsibilities for on-site evaluations of vendors, meeting with suppliers and/or prospective suppliers, responsible for problem solving with accounts payable and receiving departments (MAB 104). Each of the conditions which prevent her from performing these functions will be addressed separately below.

The letter discusses Ms. Boudreau's cervical symptamology:

Included with the records was a cervical MRI performed in 1997, which revealed a narrowing at C5/6 and an April, 2001 MRI which showed moderate to advanced central spinal stenosis, most prominent at C6/7, with evidence of cord compression, but no demonstrable compressive myelopathy. In June, 2001 and August 2001, straight leg raising was positive. Spasms, lumbosacral spine, knees, wrist, hands and pelvis were normal or showed only mild findings. Additionally, range of motion of joints and spine was full until June, 2001 when lumbar and cervical measurements were inconsistent. Ms. Boudreau's strength has been within functional limits and there are no documented neurological abnormalities throughout the records. Ms. Boudreau has been independent in gait throughout records although she prefers to use a scooter or can when walking long distances. Although Ms. Boudreau's cervical MRI did indicate moderate to advanced central stenosis, clinical exams were essentially unremarkable. This medical evidence does not substantiate an impairment that would prevent Ms. Boudreau from performing the duties of her sedentary occupation.

The reports of Slatersville Physical Therapy, Inc. from May 18, 2000 to August 30, 2000 (MAB 0318-0349) are full of clinical reports documenting limited range of motion, increased pain with activity, muscle spasms, and functional restrictions. Each of her treating physicians documented and reported their clinical observations regarding Ms. Boudreau's difficulty ambulating, problems with fatigue, and pain.

<u>FATIGUE AND SLEEP DEPRIVATION</u>

The letter goes on to state:

Ms. Boudreau has also reported fatigue and sleep difficulties. In September, 2000, Ms. Boudreau reported that she had chronic fatigue syndrome for five years which worsened. Records reflect that fatigue was reported in September, 2000 and February, 2001, and thereafter exertion. Sleep difficulties were reported from September, 2000 through January, 2001, however, fatigue was not troublesome during this time period. Additionally, only intermittent sleep difficulties were reported after June, 2001.

Ms. Boudreau's fatigue and sleep difficulties are dismissed by the simple assertion that:

"It is not expected that Ms. Boudreau's occasional sleep difficulties would have prevented her from working continuously considering her longstanding history of these problems for which she continued to work with."

This assertion is simply not supported by anything in the record. To the contrary, all of Ms. Boudreau's treating physicians have documented that Ms. Boudreau's fatigue and sleep deprivation have increased over time as her complaints of pain have increased. Not a single health care provider has opined that this problem has improved. Ms. Boudreau reported it was necessary for her to take catnaps in the bathroom at work (MAB 0286).

FIBROMYALGIA AND LYME DISEASE

The April 25th letter similarly discusses Plaintiff's condition of fibromyalgia.

> We have also reviewed records pertaining to Ms. Boudreau's diagnosis of fibromyalgia. In September, 2000, Ms. Boudreau indicated that she has had fibromyalgia for five years which worsened. Achiness and pain were reported in various parts of the body as well as overall body pain since at least November, 2000. She reported that her level of pain could vary from day to day. The medical evidence reveals no evidence of a significant rheumatological condition in blood work nor on clinical exam. Ms. Boudreau did have tender points consistent with fibromyalgia, however, these tender points would not, in and of itself, prevent Ms. Boudreau from performing a sedentary position. Additionally, her physicians have consistently encouraged Ms. Boudreau to engage in exercise on a regular basis.

This paragraph is directly contradicted by the November 13, 2000 report from University Medical Group (MAB 0362).

That reports states:

> 50 year old female, OA spine constant pain (hips, shoulder, hands, knees, feet) worse with activity symmetric. Knees have given out on her. Back pain (lower) and hip pain. Denies numbness/tingling...Saw Dr. Clough tested positive for Lyme. On Doxcline for past two weeks. She is having difficulty handling objects...Poor sleeps. Wakes up with pain.
>
> Trigger points multiple including supraspinatous, trapezious...

The April 25, 2002 letter then addresses Ms. Boudreau's Lyme disease symptoms:

> Records document a diagnosis of Lyme disease. Ms. Boudreau has reported achiness for years, which is also consistent with fibromyalgia symptoms. Although her Western Blot was positive for acute Lyme in October 2000, she was apparently placed on antibiotics. She had no cardiac or neurological abnormalities, which would signify any progression. There is no evidence to suggest that this condition would continuously prevent her from working.

To the contrary, both Drs. Wendy Clough and Paul Aubuchon provided extensive reports to Prudential documenting Ms. Boudreau's inability to work due to Lyme disease and fibromyalgia (MAB 0062-0064; 0332-0334).

> This patient does have fibromyalgia. She is also under treatment for Lyme disease which is closely linked with fibromyalgia in this geographic region. Her symptoms also qualify her for Chronic Fatigue Syndrome. The patient's symptomalogy is severe including severe fatigue, east fatigability, sweats, shortness of breath, palpitations, myalgias and leg cramps, arthralgias, irritable bowel symptoms, back and neck pain, headaches, lightheadedness, paresthesias, visual floaters, difficulty focusing of vision and blurred vision, short-term memory lapses, great difficulty in concentrating and difficulty with speech. She has disrupted nighttime sleep and requires sleep time during the day. When she does occasionally push herself to a greater level of effort, she then collapses and has to spend several days in bed. Any effort to do this continuously such as in an employment situation will severely worsen her medical condition and make her even more difficult to treat. This patient has sought treatment with many different physicians and many different approaches have been tried including for CFS, FM and Lyme disease. So far, these treatments have been notably successful.

## SUMMARY OF PHYSICAL IMPAIRMENTS

The April 25th letter discusses nine separate physical problems, degenerative disc disease, fatigue and sleep difficulties, fibromyalgia, Lyme disease, headaches, cognitive symptoms, irritable bowel syndrome, and carpal tunnel syndrome. After describing each, Prudential summarily dismisses the problem as non-debilitating without any analysis or support from a medical professional.

Additionally, each problem is viewed separately and at no time is Ms. Boudreau's condition viewed in her entirety. The SOAP note dated April 22, 2002 (MAB 0476-0482) describes Ms. Boudreau as a "52 year old buyer (per ER, job, is sedentary, office/phone work with no heavy lifting) out of work for multiple conditions." This simple characterization of her job as "office/phone work" is in sharp contrast to her detailed job description. The analysis then goes on to list nine conditions separately, then summarily dismisses each problem as non-debilitating. Again, at no time is any consideration given to the effect the multiple problems have on Ms. Boudreau's ability to work.

## PRUDENTIAL CHANGES ITS APPROACH

The decision of Prudential Insurance to terminate benefits was again appealed (MAB 0112). Additional medical records were submitted to refute the position taken by Prudential in its April 25th letter. Specifically, Dr. Wendy Clough addressed the letter (MAB 0115). She describes Ms. Boudreau's symptomatology as severe and includes among them "severe fatigue, easy fatigability, sweats, shortness of breath, palpitations, myalgias and leg cramps, arthralgias, irritable bowel symptoms, back and neck pain, headaches, lightheadedness, parethesias, visual floaters, difficulty focusing of vision and blurred vision, short-term memory lapses, great difficult in concentrating and difficulty with speech."

Additional documentation was submitted including a neuropsychological evaluation (MAB 0122-0130). The evaluation was referred by Prudential to Dr. Stephen Gersen for review (MAB 0133). He apparently found the test to be valid and to support an impairment (MAB 0136-0137). Based on Dr. Gerson's report Ms. Boudreau's benefits were temporarily extended through January 31, 2003.

Notably, Prudential, up to this point, had contested each and every complaint described by Ms. Boudreau and her physicians. However, faced with the results of Dr. Gerson's review, Prudential elected to resume disability benefits. However, even this decision to resume benefits is arbitrary and capricious in that Prudential unilaterally decided to classify her disability as being caused, at least in part by a mental, psychoneurotic or personality disorder. (MAB 0139; SOAP Note 10/01/02; MAB 0487)

This decision effectively limits Prudential's exposure to two years. The SOAP Note dated 10/01/02 (MAB 0487) clearly demonstrates Prudential's approach.

> In reviewing file EE is OOW (out of work) due to fibro and associated fatigue, along w/depression and reported cognitive deficits. EE's AP (Dr. Clough was asked to provide PE evidence or direct observations of any deficits (physical and cognitive). Dr. Clough advised that NP testing was to be performed to assess cognitive functioning. This was recently received and it appears there are some mild impairments noted on testing. Evalutor notes that EE's presentation is consistent with that of a fatiguing illness such as fibro, however the evaluator also notes that EE's depression may contribute or exacerbate her symptoms. MN limit is in 10/02 and it may be appropriate to issue ben;s through MN limit as EE's disability is caused at least in part due to a mental nervous condition.

This unilateral decision is made despite the fact that Ms. Boudreau has never claimed disability due to a mental or psychological disorder and even though Prudential has doubts. See for example the SOAP Note of October 14, 2002 (MAB 0489)

> Claim reviewed w/psych med consultant. Review of NP testing reveals a valid test w/good effort. Test reveals recent memory impairment and depression. It is difficult at this time to determine if cognitive impairments are a direct result of EE's depression, or her other conditions of lyme disease or fibromyalgia. It is also noted that the impairment could be related to EE's chronic pain and the amt of med's she is taking. The rec's support an impairment, however further review is needed to determine if the impairment is subject to the MN limit. Suggest doc to doc call to determine the extent of EE's depression and cognitive difficulties. Consider approaching recon through MN limit pending outcome of call.

<u>PRUDENTIAL'S EFFORTS TO TERMINATE BENEFITS</u>

Shortly thereafter, Ms. Boudreau relocated to Florida (MAB 0142, 0149). At that point, Prudential decided to conduct surveillance on Ms. Boudreau (MAB 0166-0178) and scheduled another neuropsychological test with Dr. Harold H. Smith (MAB 0180). Dr. Smith was informed by letter that Ms. Boudreau stated to the examiner in her earlier test that she "needed to fail this test". He is not told

that the examiner subsequently determined that Ms. Boudreau may have misspoken and that he is satisfied with results.

Additionally, Dr. Smith is informed that, "we have directly observed Ms. Boudreau riding a bicycle, driving an automobile, and opening a club house pool within her community." He has not provided a copy of the surveillance, which in fact indicates she rode her bicycle for four minutes, drove three miles and picked up a floatation device. Dr. Smith is paid $7,560 (MAB 0191). This neuropsychological test is the only testing requested and paid for by Prudential and is done simply because they did not like the results of Dr. Gerson's review of the prior test.

The extent of Prudential's arbitrary and capriousness is most evident when one compares a letter dated August 7, 2003 to one dated October 21, 2003. The August 7th letter is conspicuously omitted from the Administrative Record, but a copy is attached hereto as Exhibit A. Both letters are addressed to Ms. Boudreau's attorney and both conclude that she does not meet the requirements to receive LTD benefits.

THE AUGUST 7TH LETTER FROM PRUDENTIAL

The August 7th letter first discusses only two of Ms. Boudreau's physical complaints, degenerative disc disease and carpal tunnel syndrome and dismisses both as being insignificant. No mention is made of her seven other physical complaints.

The letter also states:

> In a neuropsychological evaluation performed on August 30, 2002, it was noted that upon completion of the clinical interview Ms. Boudreau stated, "I need to fail this". The importance of putting forth her best effort was discussed. She then re-stated, "I need to fail this, but it needs to be done honestly". A second discussion regarding the importance of putting forth her best effort was performed prior to certain tests. (MAB 0136-0137)

In that August 7th letter, the remainder of Dr. Smith's test results are omitted, including the Impressions section:

> IMPRESSIONS: In sum, Ms. Boudreau's neuropsychological profile reveals significant deficits in areas of sustained attention, verbal memory, and aspects of upper extremity motor function, as well as mild executive dysfunction. Other areas of cognition were generally well within normal limits. Although there was some initial concern about Ms. Boudreau's effort during the early portion of the exam, these concerns were addressed, and the results described here are judged to be an adequate representation of her current abilities. The nature and extent of Ms. Boudreau's cognitive difficulties are consistent with those typically described in fatiguing illnesses (e.g. Lyme disease, fibromayalgia, chronic fatigue syndrome). If deemed medically appropriate, SPECT may be beneficial in identifying perfusion defects, which may be contributing to her cognitive deficits. It should also be noted that Ms. Boudreau described psychological distress, particularly depressive and anxiety symptoms, as well as debilitating fatigue. Although it is unlikely that these symptoms account solely for the cognitive impairment noted, they may well contribute to or exacerbate her cognitive difficulties. (MAB 0128).

Also, Dr. Gersen's results are omitted despite Prudential's prior finding as related in the SOAP Notes referred to above.

THE OCTOBER 21, 2003 LETTER FROM PRUDENTIAL

The October 21, 2003 letter goes a completely different route. It discusses the medical records of Dr. Cozzolino, who began treating Ms. Boudreau when she relocated to Florida. Although Dr. Cozzolino confirmed all of Ms. Boudreau's prior physical complaints including Lyme disease, chronic pain, headaches, back pain and cognitive dysfunction, Prudential perfunctorily relates each condition without comment. It then discusses Ms. Boudreau's physical activities in a most disingenuous fashion.

The letter disingenuously relates the results of the surveillance discussed previously. It notes Ms. Boudreau was:

> ...was observed in the morning hours riding a bicycle to the community clubhouse, Ms. Boudreau bent at the waist to retrieve a backpack and floatation device from the ground. Ms. Boudreau was later observed driving to a Doctor's office and a local pharmacy.
>
> On June 17, 2003, Ms. Boudreau was observed doing yard work outside the residence, bending at the waist and using a rake and water hose. Ms. Boudreau was observed walking a small dog. Ms. Boudreau as observed driving to a department store and a donut shop. Ms. Boudreau was observed driving her vehicle approximately 24 miles displaying no apparent difficulty.
>
> On June 18, 2003, Ms. Boudreau was observed walking without medical supports or braces. Ms. Boudreau was observed as she was a passenger in the vehicle as she had her car serviced.

The letter concludes:

> We have determined that Ms. Boudreau's medical condition would not prevent her from performing the duties of her occupation as a Buyer. Although, Ms. Boudreau may have experienced symptoms which have required medical treatment, the information contained in her medical records does not indicate that Ms. Boudreau's symptoms would prevent her from working. The available evidence demonstrates Ms. Boudreau's activities are consistent with and exceed the physical demands of her occupation.

The surveillance actually showed a four minute bicycle ride, a three mile automobile ride, and seven minutes of raking. In addition, it should be noted that Prudential's initial denial letter dated April 25, 2000 mentioned, "her physicians have consistently encouraged Ms. Boudreau to engage in exercise on a regular basis." Additionally, that the surveillance report relies upon Plaintiff's trips to a doctor and a pharmacy as evidence of activity, relied upon to deny her benefits, is beyond outrageous. It is repugnant to the notions of decency and fair play.

A subsequent appeal with additional medical reports proved futile (MAB 0217-0218). Ms. Boudreau again appealed the decision of Prudential Insurance denying her claim for LTD benefits. She submitted to support her appeal a vocational assessment performed by Paul Murgo (MAB 0225-0230) and a medical review prepared by Dr. Edward Feldman (MAB 0456-0457). Both of these reports supported the claim that Ms. Boudreau was totally disabled. Prudential arranged a review by Dr. Lumpkins, a rheumatologist (MAB 0262-0269)

Prudential does not comment on Mr. Murgo's vocational assessment at all. Nor does it comment on Dr. Feldman's opinion that Ms. Boudreau is totally disabled. Instead, it addresses Dr. Lumpkins report, which focused on five areas.

First Dr. Lumpkins addressed Ms. Boudreau's cervical stenosis and indicated she would be advised to restrict her lifting. Secondly, she addressed the carpal tunnel and opined, "there is no evidence to support any restrictions for this medical condition." This conclusion has been contradicted by prior evaluations conducted by Prudential. Dr. Lumpkins then discussed Ms. Boudreau's Lyme disease and stated, "there is no evidence to support that Ms. Boudreau experiences active Lyme disease." Again, the prior finding of Prudential directly contradicts this conclusion.

Dr. Lumpkins did find that, "Ms. Boudreau meets the criteria for a diagnosis of fibromyalgia", but that was not sufficient to support a claim for total impairment.

Finally, Dr. Lumpkins concludes that "although there is evidence that Ms. Boudreau may experience some symptoms of pain…a period of observation revealed that Ms. Boudreau has the ability to drive, ride a bicycle, bend, lift, carry and perform household maintenance independently." (emphasis added)

Dr. Lumpkins' findings have no basis in fact, are not supported by any records in the file and are used by Prudential to deny Ms. Boudreau's claim. More importantly, these findings are not based upon objective medical reports, personal observations of the doctor or even a review of the surveillance tape. Rather, it was based upon the misleading, if not altogether false, description of the plaintiff's activity level as reported by the entity seeking to discontinue her benefits!

On February 25, 2005, Prudential sent a letter to Ms. Boudreau's attorney (MAB 0270-0271) stating that it was awaiting completion of a medical review. The letter stated, "the unresolved issue(s) that prevents us from making a determination at this time is that we do not have sufficient medical evidence to determine whether Ms. Boudreau meets the…definition of disability." This statement was made after nearly five years of contesting the initial denial. In the interim, Ms Boudreau had submitted medical records from University Medical Group, Landmark Medical Center, Slatersville Physical

Therapy, Rhode Island Hospital, Wendy Clough, M.D., University Medicine Foundation, Dennis Aumentado, M.D., Kenneth Catallozzi, M.D., Landmark Medical Center, Sam Donta, M.D., Joseph Cozzolino, M.D., Florida Medical Clinic, Michael Cichen, M.D. and Dr. Edward Feldman. All told, these submissions constituted approximately 165 pages of records. At no time does Prudential request a medical examination of Ms. Boudreau.

On March 20, 2005, Prudential completed its review of final appeal and determine that the decision to deny Ms. Boudreau LTD benefits was appropriate. It based its decision solely on a review of records by Dr. Lumpkins. The review was limited to Ms. Boudreau's Lyme disease and does not discuss any of her myriad medical problems. Though Dr. Lumpkin admitted that there was objective evidence of any abnormality (agammaglobalineamia) and that this disease could cause physical impairments that would limit functioning. However, she concluded that the available medical records did no demonstrate an impairment of sufficient severity to require physical limitations.

Ms. Boudreau initially filed for LTD benefits based on nine separate medical problems. Lyme disease, chronic pain, fatigue, carpal tunnel syndrome, irritable bowel syndrome.

Prudential has found each of the problems to be corroborated by medical records over the almost five-year period this claim has been pending. However, each corroborative review or finding has been summarily dismissed as not being of sufficient severity. At no time was Ms. Boudreau's overall physical condition considered.

According to Prudential's analysis, the objective evidence of cervical stenosis is not disabling because Ms. Boudreau would be limited to not lifting more than twenty pounds. The positive Western Blot test proves Lyme disease infection, but Ms. Boudreau is not disabled because she was placed on antibiotics. The objective evidence of carpal tunnel syndrome is only disabling for six weeks. Ms. Boudreau has symptoms of depression but Prudential would not consider it because it she had exceeded the mental /psychological two year limitation. There was a new diagnosis of hypogammaglobaulimia but Prudential concluded it had not been demonstrated to cause impairment of sufficient severity to require physical limitations. Ms. Boudreau's other problems, chronic fatigue, sleep difficulties, headaches, irritable bowel syndrome, and cognitive symptoms, are not ever discussed. However, the comment during a neuropsychological test that "I need to fail this test", although not given any context and explained by the examiner who is satisfied with the results, is justification for denying benefits. So, too, are the "direct observations" although limited to a three-minute bicycle ride, a four-minute automobile drive and seven minutes of raking.

## VI. ARGUMENT

Prudential's decision in this particular case shows not only an abuse of discretion, but also an indifference to ERISA's underlying aim to "promote the interests of employees and beneficiaries in employee benefits plans," Grady, supra at 105, citing Firestone, and to "protect…the interests of participants in their employee benefit plans and their beneficiaries." 29 U.S.C. §1001 (b). In the face of unrebutted objective evidence of Ms. Boudreau's disability, the plan administrator denied Ms. Boudreau's claim for benefits.

For these reasons, Plaintiff urges this court to rule that the decision of the plan administrator was arbitrary and capricious and an abuse of discretion and that Ms. Boudreau deserves the long-term disability benefits, which Bacou USA, Inc. offered to her as a benefit of her employment.

A. Prudential's Decision to Deny Ms. Boudreau's Disability Benefits Meets the Onerous Standard of "Abuse of Discretion"

The plaintiff and defendant agree that the arbitrary and capricious standard applies to this litigation. "Courts applying the 'arbitrary and capricious' standard in the ERISA context have stated that the 'district court may overturn a decision of the plan administrator only if it is 'within reason, unsupported by substantial evidence or erroneous as a matter of law'". Greene v. Metropolitan Life Insurance Company, 924 F.Supp. 351, 357 (D.R.I. 1991) citing numerous other cases. "Review under the standard is narrow and does not allow the court to substantiate its own judgment for that of the administrator of a plan," absent an abuse of discretion. Id. See also Coleman v. Metropolitan Life Insurance, 919 F.Supp. 573 (D.R.I. 1996); Grady v. Paul Revere Insurance Company, F. Supp. 2d 100 (D.R.I. 1998). However, as discussed supra, the "arbitrary and capricious" standard of review must be tempered by the overwhelming fiduciary standard applied to any plan administrator's actions requiring him/her to "act solely in the interest of plan participants and their beneficiaries." Lang v. Long Term Disability plan of Sponsor Applied Remote Technologies, Inc., 125 F.3d 794, 798 (9th Cir. 1997) (citing 29 U.S.C. §1001(b)). After all, ERISA's underlying aim is to promote and protect… the interest of participants in their employee benefit plans and their beneficiaries. (29 U.S.C. 1001(b)).

Greene v. Metropolitan Life Insurance Company is a March 1992 Rhode Island Federal District Court case dealing with long-term disability eligibility based on Chronic Fatigue Syndrome (CFS). In 1992, CFS was a burgeoning, ill-defined and misunderstood condition. In Greene, the court held that, under the particular facts that MetLife did not act arbitrarily and capriciously by relying on a non-examining physician's extremely thorough opinion that the plaintiff was not disabled.

The case at hand, however, is factually distinct from Greene. Greene stands for the proposition that "where all medical experts possess virtually identical information regarding claimants seeking long term disability benefits under an ERISA plan, but their conclusions differ, [the] applicable arbitrary and

capricious standard prevents [the] district court from injecting its own judgment in the case to vacate [the] fiduciary's denial of benefits." Greene at 351. When the reviewing physicians in Greene rendered their opinion that the claimant was not disabled, they were privy to all the medical evidence of record. After reviewing all the medical evidence of record, the Greene reviewing physicians set forth on two separate occasions their detailed medical reasoning as to why the plaintiff did not meet the plan definition of disabled. The reviewing physician's reports included "Medical Findings" which notes the presence or absence of given medical symptoms, an evaluation of laboratory findings, evaluation of patient's weight gain, resting pulse, the "diagnosis" and an assessment of "functional capacity."

In Greene, the reviewing physician's review of the evidence was detailed and thorough, not cursory. The Greene court noted that the treating physician's information contained "rhetoric", and "no new information pertinent to Greene's condition" nor did it address either of the [reviewing physicians'] reports. Greene at 358. Because of the infirmity of the treating physician's information, the reviewing physician stated "[t]he information available does not [even] permit us to independently confirm a diagnosis of chronic fatigue syndrome." Accordingly, based upon the infirmity of the treating physician's information contrasted with the detail and specificity of the reviewing physician's information, the Greene court held that MetLife's reliance on the non-treating, non-examining reviewing physician was appropriate under those facts.

Similarly, in Coleman v. Metropolitan Life Insurance Company, 919 F.Supp 573 (D.R.I. 1996) the plaintiff complained that MeLife's decision to deny benefits was "arbitrary and capricious" in that it essentially ignored reports and narratives of the plaintiff's treating physician, Leslie Stern, M.D., and opted instead to rely on the opinions of their own physicians, Dr. Allen and Dr. Bertrand. The Court's analysis in Coleman revealed that the treating physician flip-flopped in his disability determination. At one point, Dr. Stern stated that "I would consider [the plaintiff] likely capable of light work as of September 1, 1993." Coleman, at 581. As a result, MetLife terminated Coleman's benefits. However, Dr. Stern then "backpedaled once again" in his November 11, 1993 report/narrative indicating that the plaintiff was again "totally disabled." Coleman at 582. The Coleman court correctly noted that "Dr. Stern provided only a completely subjective basis for his finding that plaintiff was totally disabled." In fact, the section on the Physician's Statement labeled "Objective Findings (including test results)" was left blank by Dr. Stern. Id. Again, based upon the infirmity and subjectivity of the treating physician's information, contrasted with the detail and specificity of the reviewing physician's findings, the Coleman court found that MetLife's reliance on the reviewing physician's opinions did not constitute an abuse of discretion.

> Furthermore, the opinions of Dr. Allen and Dr. Bertrand cannot be ignored. The fact that the plaintiff's physicians disagreed with these other physicians does not by itself establish arbitrary and capricious action on the part of MetLife. It cannot be said that MetLife was unreasonable in relying on Dr. Allen's and Dr. Bertrand's opinions over

> those of Dr. Stern, especially given the frequency with which Dr. Stern's diagnosis differed from his earlier expressed opinions.

Coleman at p.___-

In Coleman, MetLife continuously requested objective evidence to support the plaintiff's claim, but plaintiff failed to provide such evidence.

Contrary to the Greene and Coleman cases, here there is no dispute that the plaintiff was disabled, consistent with the objective findings. In the case at hand, it is undisputed that Ms. Boudreau suffered from objective evidence of several disorders and that she was totally disabled as a result. These facts are admitted to by Prudential's employees and representatives. The experts retained by Prudential consistently found objective evidence to support Ms. Boudreau's complaints.

B. PRUDENTIAL'S DECISION SUBVERTS THE INTENT OF ERISA

ERISA benefits are made available for the "welfare" of insured participants. 29 U.S.C. §1002(1) defines ERISA benefits as "welfare benefits." In attempting to understand the significance and consequence of the fact that ERISA is "remedial legislation," many courts have found the principles developed in Social Security case law to be "instructive in ERISA cases." See Halpin v. W W Granger, Inc., 962 F. 2d 685, 695 N.11(7th Cir.1992); and Donaho v. FMC Corp, 74 F.3d 894, 901 (8th Cir. 1996). In Social Security cases, courts review administrative law judge decisions under a "substantial evidence" standard. (Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed. 2d 842 (1971). Courts have nonetheless tempered that yardstick by their consideration of Congress' intent that the Social Security Act be a remedial statute, to be broadly construed and liberally applied. Conklin v. Celebrezze, 319 F.2d. 569 (7th Cir. 1963). "In a close case, it is well to bear in mind that the Social Security Act is a remedial statute which must be liberally applied; its intent is inclusion rather than exclusion." Cohen v. Secretary of DHHS, 964, F.2d 524, 531 (6th Cir. 1992) citing Marcus v. Califano, 615 F. 2d 23, 29 (2nd Cir. 1979); See also, Black v. Sullivan, 793 F.Supp. 45, 47 (D.R.I. 1992); Schena v. Secretary of H.H.S., 635 F.2d 15, 20 (Vt Cir.1980). In Pelletier v. Secretary, 525 F.2d 158, 161 (1st Cir.1995), Circuit Judge Gerald Heaney has stated:

> Congress enacted the social security disability insurance program in order to provide benefits to individuals who become disabled and can no longer 'engage in any substantial activity by reason of any medically determinable physical or mental impairment.' The program is intended to aid workers who, after having contributed to the nation's workforce, are unable to continue to do so because of a disability. The underlying purpose of this program is to ease the economic dislocations and hardships that often accompany disability. The Act is a remedial one which should be broadly construed and liberally applied to effectuate its humanitarian goals.

Gerald Heaney "Why the High Rate of Reversals in Social Security Disability Cases?"; 7 Hamline L.Rev. 1,2 (1984)

ERISA, like the Social Security Act, was clearly intended by Congress to be a remedial statute. See, 29 U.S.C. §1001. It was not intended to be used as a shield to allow the denial of rightfully payable benefits. See, Carr and Liebross "Wrongs Without Rights: The Need For A Strong Federal Common Law Of ERISA," Stanford Law & Policy Review (Winter 1992-93) (scholarly journal article arguing that courts fail to construe ERISA claims in accordance with congressional purpose as set forth in 29 U.S.C. §1001).

As stated by the Seventh Circuit in Halpin, supra, "ERISA and its accompanying regulations were intended to help claimants process their claims efficiently and fairly; they were not intended to be used by the fund as a smokescreen to shield itself from legitimate claims". Halpin at 696. Accordingly, in light of the remedial purpose of the ERISA statute, while employing the arbitrary and capricious standard, this court should not insulate Prudential's decision from a penetrating review. Shining the light of day on Prudential's review, analysis, and handling of Ms. Boudreau's claim will reveal that their adverse determination was not only erroneous, but unreasonable and repugnant to public policy.

Even if this court is unconvinced that the plaintiff has presented sufficient evidence to justify an award of summary judgment in her favor, she has still raised sufficient grounds to preclude an award of summary judgment to defendant.

## VII. CONCLUSION

For the reasons 'set forth above, the plaintiff urges this court to reverse the determination of the plan administrator as said decision, under this particular set of facts, as arbitrary and capricious. Plaintiff further requests that this court deny defendant's motion for summary judgment, grant plaintiff's motion for summary judgment and award plaintiff disability benefits. No remand to the plan administrator is required, and judgment may be entered in favor of the plaintiff, inclusive of prejudgment interest, as well as an award of attorney's fees pursuant to 29 U.S.C. § 1132(g).

Alternatively, the plaintiff requests that the court find that there exists genuine issues of material fact and remand this case for trial.

Plaintiff,
Mary Ann Boudreau,
By her Attorney,

Anthony J. Gianfrancesco, Esq. (# 2762)
Baluch, Gianfrancesco, Mathieu & Szerlag
155 South Main Street
Suite 101
Providence, Rhode Island 02903
(401) 331-1434
Fax: (401) 351-9653

CERTIFICATION

I hereby certify that a copy has been sent to Michael J. Pisaturo, Esq., The Law Office of Michael J. Pisaturo, P.C., 1312 Atwood Avenue, Johnston, Rhode Island 02919 and William T. Bogaert, Esq. and Carey L. Bertrand, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 155 Federal Street, Boston, Massachusetts 02110, on this ________ day of October, 2005.

______________________________

Table of Authorities

**Cases**

Cohèn,v. Secretary of DHHS, 964, F.2d 524, 531 (6th Cir. 1992) ................ Pg. 15

Coleman v. Metropolitan Life Insurance, 919 F. Supp. 573 D.R;I. 1996)........................................................................ Pg.3, 10, 15

Conklin v. Celebrezze, 319 F.2d 569 (7th Cir. 1963)................................ Pg. 15

Donaho v. FMC Corp., 74 F.3d 894, 901 (8th Cir. 1996).......................... Pg. 15

Doyle v. Paul Revere Insurance Co., 144 F.3d 181, 183 (1st Cir. 1998)....................................................................... Pg. 3

Firestone Tire and Rubber Company v. Bruch, et al., 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 90 (1989).......................................... Pg. 2, 14

Grady v. Paul Revere Life Insurance, 10 F.Supp. 2d 100 (D.R.I.) 1998..................................................................... Pg. 2,14, 15,

Green v. Metropolitan Life Insurance,, 924 F.Supp. 351, 357 (DRI 1996)........ Pg. 3, 13,14

Griggs -Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).......................... Pg. 2

Halpin v. W W Granger, Inc., 962 F. 2d 685, 695 N.11 (7th Cir.1992)........... Pg. 15

Lang v. Long Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d 794, 798 (9th Cir. 1997) (citing 29 U.S.C. §1001(b)).................................. Pg. 2,15

Luby v. Teamsters Health , Welfare and Pension Trust Funds, 944 F.2d 1176 (3rd Cir. 1991).............................................................. Pg. 3

Mesnic v. General Electric Co., 950 F.2d 816, 820 (1st Cir.1991), cert. denied, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed. 2d 586 (1992)................................................... Pg. 3

Pelletier v. Secretary, 525 F.2d 158, 161 (1st Cir. 1995).......................... Pg. 17

Richardson! v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed. 2d 842 (1971)............................................... Pg. 17

Schena v. Secretary of H.H.S., 635 F.2d 15, 20 (Vt Cir.1980)..................... Pg. 17

Van Boxel v. Journal Company Employees' Pension Trust'836 F.2d 1048, 1052-3 (7th Cir. 1988)...................................... Pg. 2

Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan, F.2d (1st Cir. 2004)...................................................................... Pg. 3