UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MARY ANN BOUDREAU | : | |
| | : | |
| v. | : | C.A. No. 05-154S |
| | : | |
| BACOU USA, INC. and THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

**Background**

Before this Court are Cross-Motions for Summary Judgment (Document Nos. 13 and 16) pursuant to Fed. R. Civ. P. 56 filed by Defendants on September 29, 2005 and by Plaintiff on October 7, 2005, respectively. The parties are Mary Ann Boudreau ("Plaintiff") and Bacou USA, Inc. and The Prudential Insurance Company of America (collectively "Defendants" or "Prudential"). This matter involves a claim for long-term disability ("LTD") benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. It has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local R. 32(c). A hearing was held on December 5, 2005. After reviewing the administrative record and memoranda submitted, listening to the arguments of counsel and conducting independent research, I recommend that Plaintiff's Motion for Summary Judgment be DENIED and Defendants' Motion for Summary Judgment be GRANTED.

**Statement of Facts**

The following undisputed facts are culled from the parties' Local Rule 12.1(a) statements and the administrative record.

Plaintiff was employed as a Buyer for Uvex Corp. (a subsidiary of Defendant Bacou USA, Inc.) for almost twenty years. (MAB 0055-0056; 0061). Plaintiff worked for many years, despite suffering from several medical problems. (MAB 0466). Plaintiff ceased working for Uvex on April 21, 2000. (MAB 0466). Plaintiff initially filed a claim for LTD benefits based on severe fatigue, fibromyalgia, decreased cognitive function, dizziness, weakness, confusion and poor memory. (MAB 0051-0057). Prudential reviewed the medical records submitted in support of Plaintiff's claim, including records from Slatersville Physical Therapy; Dr. Paul Aubuchon, clinical psychologist; and Dr. Wendy Clough, infectious disease. (MAB 0089-0090). Prudential determined on June 8, 2001 that Plaintiff was not eligible for benefits, as the medical records reviewed did not document a change in her chronic conditions which caused her to cease working. (MAB 0089-0090).

The LTD Plan in question was established and maintained by Plaintiff's former employer, Uvex Corp. through Defendant Bacou USA, Inc. (MAB 0023-0051). The Plan's benefits are insured by Prudential. Compl. ¶ 3. The Plan is governed by ERISA. Compl. ¶ 2. With regard to claims for total disability benefits, the Plan provides as follows: "Total Disability" exists when Prudential determines that all of these conditions are met:

(1) Due to sickness or accidental injury, both of these are true:

> (a) you are not able to perform, for wage or profit, the material and substantial duties of your occupation;

> (b) after the Initial Duration of period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a Doctor. (MAB 0031)

The Plan defines the Elimination Period as, "For each period of Total Disability due to Sickness or accidental Injury, the first 180 days of continuous Total Disability." (MAB 0026). To qualify for the Plan's LTD benefits, a claimant must be totally disabled for a continuous period of 180 days during which benefits are not payable. (MAB 0026). The Plan's benefit limitation for mental, psychoneurotic or personality disorder clause provides as follows: "[I]f your Disability, as determined by Prudential, is caused at least in part by [such] a...disorder,...benefits are not payable for your disability for more than 24 months. There are these exceptions if you are totally disabled at the end of the twenty-fourth month for which benefits are payable:

> (1) If you are confined in a Hospital for one or more of the disorders above at the end of the twenty-fourth month, the following will apply. While you remain Totally Disabled, benefits are payable for the duration of that Confinement and, unless (2) below applies, for up to three additional months after your Confinement ends.
>
> (2) If, after the twenty-fourth month, you become Confined in a Hospital for one or more of the disorders above for at least 14 consecutive days, the following will apply. While you remain Totally Disabled, benefits are payable for the remaining duration of that Confinement and for up to three additional months after your Confinement ends.

But, benefits are not payable for more than the Maximum Benefit Duration", i.e., twenty-four months (MAB 0034).[1]

On or about February 14, 2002, Plaintiff, through her attorney at the time, appealed the initial June 8, 2001 denial decision of Prudential. (MAB 0100-0101). Prudential reviewed the medical reports provided in support of the appeal, including records from Dr. Wendy Clough, Dr. Kenneth Catallozzi, Dr. Bernard Zimmerman, Dr. Sam Donta and Slatersville Physical Therapy. (MAB 0108-0111). On or about April 25, 2002, Prudential determined that Plaintiff was eligible for total disability benefits for the limited period of October 10, 2000 through April 8, 2001 due to her treatment for carpal tunnel syndrome and recovery from carpal tunnel surgery. (MAB 0108-0111). However, Prudential determined that the medical records did not substantiate total disability beyond April 8, 2001. (MAB 0110).

On September 7, 2000, Dr. Aubuchon, a clinical psychologist, indicated that Plaintiff has a pain disorder with both medical and psychological variables. He reported that, medically, she has fibromyalgia and chronic fatigue syndrome, and psychologically, she suffers from major depression. (MAB 0060-0061). Dr. Aubuchon found Plaintiff to be totally incapable of employment at that time. Id. On April 7, 2001, Dr. Donta diagnosed chronic/active Lyme disease. He decided on a course of treatment that included clarithromycin and hydroxychloroquine and followup in three months. (MAB 0394). Dr. Clough recommended neuropsychiatric testing to examine possible deficits

[1] On November 8, 2002, Prudential approved an extension of Plaintiff's benefits from April 9, 2001 through October 9, 2002. (MAB 0134). A further extension through January 31, 2003 was approved on December 4, 2002. (MAB 0141). Ultimately, it appears that Plaintiff received LTD benefits through October 31, 2003. (MAB 0202-0206; 0496). Thus, Plaintiff received LTD benefits for approximately thirty-six months (October 10, 2000 through October 31, 2003), which exceeds the twenty-four month maximum for mental, psychoneurotic or personality disorder-based claims.

underlying Plaintiff's cognitive complaints. (MAB 0120). At the request of Prudential, Dr. Stephen Gerson performed a file review of the medical records. (MAB 0133). Dr. Gerson noted that it was difficult to determine if Plaintiff's cognitive impairments were a direct result of her depression or her other conditions of Lyme disease and fibromyalgia. Id. On November 14, 2002, Dr. Gerson noted that his file review revealed Plaintiff's "tendency to not make full effort and that validation testing should be done to assure that malingering...[is] not impacting the final result." (MAB 0137). This conclusion was based on both Dr. Gerson's review of the test results and a pre-test comment by Plaintiff to Dr. Holly Westervelt, a consulting clinical neuropsychologist, that "I need to fail this." Id.

As part of its review of the appeal, Prudential retained an investigator to surveil Plaintiff's activities over a three-day period in June 2003 at and around her home in Florida. (MAB 0166-0177). The investigator observed Plaintiff riding a bicycle from her house to a community clubhouse pool from 8:51 a.m. to 8:55 a.m. He also noted that Plaintiff held on to a flotation device and was wearing a backpack during the four-minute bike ride. Plaintiff was observed bending at the waist to pick up her backpack and walking into a gated "pool area." She later biked home at 10:15 a.m. On one day, the investigator observed Plaintiff drive an automobile a total of "about 24 miles." (MAB 0168). Plaintiff was observed pushing a shopping cart containing "several large bags," and lifting those bags into her car trunk. Id. The investigator also observed Plaintiff carrying a rake and an unidentified hand tool and bending over to do some yard work for several minutes without any apparent difficulty. She was also seen using a garden hose during this period.

In 2003, Plaintiff began treating in Florida with Dr. Joseph Cozzolino, who stated she is suffering from Lyme disease, which is chronic and debilitating. (MAB 0214). Dr. Cozzolino, however, conceded that the condition is "somewhat difficult to diagnose and/or produce tangible documentation of disease." Id. Prudential arranged for Plaintiff to be examined by Dr. Harold H. Smith, Jr., a psychologist, on September 29, 2003 from 8:00 a.m. to 5:00 p.m. at its expense. (MAB 0187). Dr. Smith did not conduct any medical examination and tested Plaintiff only for cognitive dysfunction. (MAB 0193-1097). Dr. Smith concluded that Plaintiff's test data provided "no support for her claim of cognitive dysfunction." (MAB 0197).

On March 3, 2004, Plaintiff underwent a Vocational Assessment Employability Evaluation by Paul F. Murgo, M.Ed., a vocational rehabilitation counselor. (MAB 0225-0230). Mr. Murgo concluded that Plaintiff was unemployable. (MAB 0230). Dr. Edward Feldmann, a neurologist, was retained by Plaintiff's counsel to conduct a medical record review. (MAB 0456-0457). Dr. Feldmann concluded that Plaintiff's combination of medical conditions preclude her ability to work. (MAB 0456). Dr. Feldmann also found that Plaintiff suffered from fibromyalgia, osteoarthritis, Lyme disease, carpal tunnel syndrome, migraine, depression and anxiety. Dr. Tanya Lumpkins, a rheumatologist, performed a medical file review at Prudential's request. (MAB 0239-0247). Dr. Lumpkins found evidence of fibromyalgia-like symptoms but not of impairment-level severity. (MAB 0246). Dr. Lumpkins found support for the diagnosis of depression, but again, not for the claimed level of impairment. Id.

Plaintiff was treated in Florida by Dr. Michael Cichon who concurred with the diagnosis of Lyme disease and also diagnosed severe hypogammaglobulinemia. (MAB 0463-0465). Prudential

requested that Dr. Lumpkins review Dr. Cichon's findings. (MAB 0260-0269). Dr. Lumpkins noted that the medical records document a continued positive Western Blot ("WB") for Lyme disease that can persist after successful treatment or could represent a repeat infection. (MAB 0264). However, she also noted the existence of a negative repeat ELISA (enzyme-linked immunosorbent assay) on October 12, 2004 "increasing the probability that the positive WB is a persistent positive after treatment and not active infection." (MAB 0264-0265). Dr. Lumpkins found objective support for the diagnosis of hypogammaglobulinemia, but no evidence that it was of sufficient severity to require physical limitations. (MAB 0266).

On December 23, 2004, Prudential advised Plaintiff's counsel that it had completed its review of Plaintiff's "second request for reconsideration." (MAB 0249). Prudential upheld its prior decision to terminate LTD benefits effective November 1, 2003. Relying in substantial part on a file review performed by Dr. Lumpkins, Prudential concluded that (1) the medical information supports that Plaintiff has the physical ability to perform the material and substantial duties of her own occupation; and (2) the Plan's mental disorder benefit limitation of twenty-four months applied to Plaintiff's claim regarding her symptoms of depression and anxiety. (MAB 0249-0251).

In response, Plaintiff, through her counsel, filed another appeal on January 17, 2005 to Prudential's Appeals Committee for a final decision. (MAB 0252). The final appeal was supported by additional medical documentation from Dr. Cichon. Id. On February 1, 2005, Prudential's Appeals Committee requested additional medical information from Plaintiff to complete its review. (MAB 0255). The Appeals Committee submitted the matter for a "re-review" with Dr. Lumpkins, based on the additional medical information submitted by Plaintiff. (MAB 0260). Dr. Lumpkins

was asked to respond to six specific questions arising out of Plaintiff's appeal. Id. Dr. Lumpkins did so in a detailed, ten-page report dated March 7, 2005, and she concluded that the diagnosis of chronic Lyme disease with central nervous system involvement had not been substantiated. (MAB 0267). Based on Dr. Lumpkins' "re-review" report and the Appeals Committee's own review of Plaintiff's entire file, the Appeals Committee concluded that the record did not support that Plaintiff was physically unable to perform the material and substantial duties of her sedentary occupation, and denied Plaintiff's "third and final appeal." (MAB 0273-0275). This suit followed.

**Standard of Review**

A district court, when reviewing a plan administrator's decision under ERISA, is generally required to undertake a de novo review. Allen v. Adage, Inc., 967 F.2d 695, 697-98 (1st Cir. 1992). If, however, by its terms, the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is "arbitrary, capricious, or an abuse of discretion...." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 183 (1st Cir. 1998). The parties agree that this case is governed by the "arbitrary and capricious" standard of review.

Thus, the operative inquiry is whether the administrative record before the plan administrator "could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." Twomey v. Delta Airlines Pilots Pension Plan, 328 F.3d 27, 31 (1st Cir. 2003), citing Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002). A decision to deny benefits to a beneficiary will be upheld if the administrator's decision "[was] reasoned and supported by substantial evidence." Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004). Evidence

is substantial when it is "reasonably sufficient to support a conclusion...." Id. Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision. See Gannon, 360 F.3d at 213; see also Doyle, 144 F.3d at 184 ("[s]ufficiency, of course, does not disappear merely by reason of contradictory evidence.").

When the parties choose not to submit additional evidence to the court, as in this case, there is no new factual material to be considered. Thus, the parties may ask the court to decide the case on the basis of the administrative record by way of cross-motions for summary judgment. Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003). This is not to be confused with the typical pre-trial summary judgment procedure in which the court must consider the facts in the light most favorable to the non-moving party. Id. Rather, under ERISA, "the rationality standard tends to resolve doubts in favor of the administrator." Id.

Not surprisingly, as it involves an adverse determination against a defendant in this case, i.e., Prudential, Plaintiff relies heavily on the First Circuit's recent decision in Buffonge v. The Prudential Ins. Co. of Am., 426 F.3d 20 (1st Cir. 2005). In Buffonge, the First Circuit did not alter the ERISA standard of review in any way. Rather, it reiterated that "[a]n administrator's decision must be 'reasoned' to survive 'arbitrary and capricious' review." Id. at 30, quoting Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004). In applying this standard, the court determined that the administrator's decision was not reasoned, and remand was warranted because the plan administrator knowingly relied upon a "misleading" report from a nonexamining medical consultant and "mischaracterized" the conclusions of an examining orthopedist. Id. at 30-31. As is more full

discussed below, Plaintiff has not identified similar evidentiary flaws in this case which "materially tainted" the decision-making process and thus warrant reversal and remand.

**Argument**

Plaintiff's primary theme in challenging Prudential's administrative decision is that its intent from the beginning was to "deny Plaintiff at every step of the process" and "do whatever could be done" to accomplish that result. Plaintiff contends that this improper motivation manifested itself in Prudential's failure to properly investigate and review Plaintiff's claim in several respects. Plaintiff, relying on Buffonge, 426 F.3d at 22, argues that these deficiencies "materially tainted" the review process so as to render it arbitrary. This Court disagrees and addresses Plaintiff's specific arguments below.

**A. Plaintiff's Job Duties**

Plaintiff challenges the state of the record regarding her job duties and Prudential's conclusion that her former Buyer position was a sedentary one. Plaintiff contends that this conclusion was not proven and is not supported by the record. This Court finds that the record reasonably supports Prudential's conclusion that Plaintiff's former position was sedentary.

The term "sedentary" is not used in the Plan. It was used by Prudential in its decision dated April 25, 2002 denying Plaintiff's first request for reconsideration. In particular, Prudential determined that the medical evidence did "not reflect a sickness or injury that would render [Plaintiff] Totally Disabled from performing the duties of her own occupation which is considered sedentary." (MAB 0109). Webster's dictionary defines sedentary as "requiring or marked by much

sitting" such as a "desk job." The Social Security Administration defines "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

There is substantial evidence in the record to support Prudential's conclusion that Plaintiff was employed in a sedentary or desk job. Plaintiff was employed as a Buyer. Early on in the process, Plaintiff's former employer indicated that, as a Buyer, she was not required to do any lifting, carrying, pushing or pulling, and Plaintiff sat for six hours and walked for two hours per workday. (MAB 0057). Later in the process, Prudential obtained a copy of the job description for Plaintiff's Buyer position which was consistent with the earlier description of duties and with a finding that the position was a sedentary one. (MAB 0103-0104).

Plaintiff did not present any evidence during the claim process which contradicted Prudential's sedentary finding. See Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 77 (1st Cir. 2005) (claimant bears burden of providing evidence of what his job required). On September 13, 2002, Plaintiff presented a report from Dr. Westervelt. (MAB 0122). In that report, it was noted that Plaintiff described her work as "very stressful" and the duties included "constantly talking on the phone, sending faxes, checking inventory, traveling to tour vendors' plants, and attending regular management meetings." (MAB 0125-0126). Plaintiff's own

description is consistent with Prudential's conclusion that she held a sedentary desk job. Subsequently, on March 22, 2004, Plaintiff submitted a Vocational Assessment Employability Evaluation prepared by Mr. Paul Murgo. (MAB 0224). Mr. Murgo's report does not include any description or summary of Plaintiff's actual job duties. Rather, Mr. Murgo concluded that Plaintiff's former position as a Buyer was skilled and consisted of "light" work which involves occasional lifting/carrying of up to twenty pounds and frequent lifting/carrying of up to ten pounds. (MAB 0228-0229). Mr. Murgo's conclusion is not supported by any information obtained from Plaintiff or her former employer, but rather it appears to be based solely on information contained in the U.S. Department of Labor's Dictionary of Occupation Titles (Section 012.167-050 BUYER/PLANNER (professional)). Id. Further, Mr. Murgo's assumptions regarding lifting and carrying requirements contradicts the August 25, 2000 statement from Plaintiff's employer that Plaintiff's job duties did not include any lifting or carrying. (MAB 0057).

### B. Conflict of Interest

Plaintiff contends that Prudential was improperly biased against her claim from the outset. She argues that this bias is evidenced by Prudential's mischaracterization of certain evidence and its selective and unwarranted emphasis on certain evidence.

This Court's review of the record does not reveal any impermissible bias against Plaintiff or any conflict of interest.[2] From a medical standpoint, this is a complex case, and the administrative record exceeds 500 pages. The record reveals that Prudential expended a significant amount of time,

---

[2] The First Circuit has held that "[t]he fact that...the plan administrator will have to pay [the plaintiff's] claim out of its own assets" does not alter the deferential standard of review. Glista v. Unum Life Ins. Co. of America, 378 F.3d 113, 125-126 (1st Cir. 2004).

effort and money in sorting through Plaintiff's disability claim. Plaintiff's initial LTD application dated July 31, 2000 described her conditions as fibromyalgia, chronic fatigue syndrome, chronic pain and fatigue, confusion and poor memory. (MAB 0055). Plaintiff indicated that her treatment dated back to 1996. (MAB 0055, 0124).

At the time of Plaintiff's LTD application, the record is unclear as to what caused Plaintiff to abruptly go from a long history of full-time employment to an inability to work at all. In the neuropsychological report submitted by Plaintiff on September 13, 2002, it recites her work history and states "in April 2000 she stayed home with a headache and fatigue, and has been unable to return to work since that time." (MAB 0125).

While Plaintiff was entitled to "a full and fair review" of her claim by the plan administrator, 29 U.S.C. § 1133, the seemingly immediate onset of total disability without any articulated triggering event certainly gave Prudential reasonable grounds to fully and closely examine Plaintiff's claim. It is apparent from a review of the entire record that Prudential gave Plaintiff every opportunity to support her claim and that Plaintiff's submissions were fairly evaluated over a nearly four-year period.

**1. "I Need to Fail This"**

Plaintiff obtained and, on September 13, 2002, submitted a neuropsychological evaluation to Prudential in support of her appeal. (MAB 0122). Prudential referred this report to Dr. Stephen Gerson for review. On November 14, 2002, Dr. Gerson identified "two issues that are problematic in this psych testing under the category of learning and memory" and he suggested retesting as to those categories. (MAB 0137). Dr. Gerson ultimately concluded that the neuropsychological testing

submitted by Plaintiff was "inconclusive in terms of whether there is cognitive impairment or not." (MAB 0138).

Based on Dr. Gerson's report, Prudential ultimately decided to obtain its own neuropsychological evaluation. (MAB 0180). This evaluation was conducted by Dr. Harold H. Smith, Jr. on September 29, 2003. (MAB 0193-0197). After reviewing substantial medical and other records, interviewing Plaintiff and administering several tests, Dr. Smith concluded that the test data provided "no support for her claim of cognitive dysfunction." (MAB 0197).

Plaintiff argues that Prudential's improper motivation against her claim is evidenced by its repetitive quotation of the statement "I need to fail this test." Prudential did not pull this statement out of thin air, and its repeated reference to that statement is understandable. The statement was admittedly made by Plaintiff during the neuropsychological evaluation conducted by Dr. Westervelt. Dr. Westervelt's evaluation was arranged and obtained by Plaintiff, not Prudential. Prior to any testing, Plaintiff told Dr. Westervelt "I need to fail this." Dr. Westervelt apparently believed that Plaintiff's statement was significant, as she quoted it in her report and addressed it with Plaintiff. (MAB 0126). After Plaintiff was advised of the importance of "putting forth her best effort," Plaintiff advised Dr. Westervelt that she "misspoke" and restated "I need to fail this, but it needs to be done honestly." Id. Dr. Westervelt also noted two other discussions with Plaintiff about the "importance of effort" and that the test results would be "carefully scrutinized" and "would be sensitive to poor effort." Id.

This Court cannot say that Prudential's focus on and repetition of the statement "I need to fail this" was unreasonable under the circumstances. Plaintiff's own consultant, Dr. Westervelt, felt

the comment was significant enough to discuss it at length in her report. In addition, Dr. Westervelt reported that Plaintiff's testing "effort" improved after they discussed the importance of giving a "best effort." (MAB 0126). However, Dr. Westervelt noted that several tests (Modified Mini-mental State Examination, WMS – III Digit Span and Mental Control, WAIS – III Letter-Number Sequencing, Rey-Osterrieth copy and immediate recall, and California Verbal Learning Test – II learning trials and short-delay recalls) were given to Plaintiff prior to the "effort" discussions, and it was noted that Plaintiff's "effort improved dramatically" after the "second discussion of the importance of effort." Id. There is no evidence in the record that Dr. Westervelt repeated these "pre-discussion" tests, and Prudential's consultant, Dr. Gerson, noted that the learning and memory testing conducted by Dr. Westervelt was "not corrected for effort" and "NOT done in a valid manner." (MAB 0137). (emphasis in original).

**2. "Possible Malingering"**

At the hearing, Plaintiff's attorney also objected to the use of the term "possible malingering" by Prudential in a February 18, 2003 claim file entry. (MAB 0492). He argued that Dr. Gerson never used those words, and Prudential had no basis in the record for such a conclusion. Although Dr. Gerson did not use the exact words "possible malingering," he used the term "malingering" (MAB 0137) and, based on Dr. Westervelt's report, noted Plaintiff's "tendency to not make full effort" in psychological testing. Id. Dr. Gerson specifically recommended that "validation testing should be done to assure that malingering and perfect effort are not impacting the final result." Id. This recommendation reasonably prompted Prudential to engage Dr. Smith for further testing, the results of which did not support Plaintiff's claim.

3. **The Surveillance Report**

Plaintiff further attacks the relevance and thoroughness of Prudential's surveillance. Plaintiff was surveilled by a private investigator on three separate days in June 2003. (MAB 0166-0177). Plaintiff points out that the surveillance was limited to small segments of time and revealed little about the true extent of her limitations. The surveillance report speaks for itself and does not show that Plaintiff is free from all limitations. It does, however, suggest that Plaintiff is able to engage in certain activities of daily living consistent with an ability to perform "the material and substantial duties" of a sedentary desk job. For instance, Plaintiff was observed riding a bicycle, carrying a backpack, carrying light yard tools, bending at the waist, operating a full-size car, pushing a shopping cart, lifting shopping bags, etc. (MAB 0168). It was not unreasonable for Prudential to place reliance on this report and to provide the report to its consultants for consideration.

In connection with Dr. Smith's examination, Plaintiff identifies a single misrepresentation of fact which she argues exemplifies the biased treatment of her LTD claim. Prudential concedes that there was a misstatement of fact made to Dr. Smith but argues that this single mistake does not warrant remand because there is no indication Dr. Smith relied upon the inaccuracy. This Court agrees that the single error was harmless.

In its June 26, 2003 referral letter to Dr. Smith, Prudential indicates that Plaintiff has been observed "opening a club house pool within her community." (MAB 0183). Dr. Smith was provided with a copy of Plaintiff's "file" and the June 2003 surveillance report. Id. Prudential did not dispute the inaccuracy of this statement. Although the surveillance report indicates that Plaintiff rode her bike to the community clubhouse at approximately 9:00 a.m. and entered the gated "pool

area," there is nothing in the report to indicate that Plaintiff was responsible for opening the pool. (MAB 0169-0170). However, there is no indication in Dr. Smith's October 6, 2003 report that he relied upon the misstatement in reaching a conclusion unfavorable to Plaintiff's claim. Dr. Smith specifically identified fifteen records or categories of records which he reviewed in connection with his examination of Plaintiff. (MAB 0193-0194). This included the MJM Investigations surveillance report which is the best evidence of Plaintiff's activities involving the clubhouse pool. (MAB 0193). Dr. Smith administered several tests to Plaintiff, and there is no indication in his report that he relied upon the pool "misstatement" in any material way in reaching his conclusion. Rather, it appears that Dr. Smith's conclusions about Plaintiff's cognitive function were based, in large part, on his observations of Plaintiff and her average or normal testing results. (MAB 0197).

**C. Dr. Lumpkins' Reports**

After Plaintiff's LTD benefits exceeded the twenty-four month mental/psychoneurotic maximum, Prudential's focus naturally shifted to Plaintiff's physical illnesses. (MAB 0240). "To assess [Plaintiff's] functionality effective November 1, 2003, a file review was arranged and performed by Dr. Tanya Lumpkins, Rheumatologist." (MAB 0250). Dr. Lumpkins issued reports dated December 20, 2004 (MAB 0239-0247) and March 7, 2005 (MAB 0259-0269). Because Prudential relied heavily on Dr. Lumpkins' reports in its denial of Plaintiff's "second request for reconsideration" on December 23, 2004, (MAB 0249), and its denial of Plaintiff's "third and final appeal" on March 30, 2005, (MAB 0273), Plaintiff naturally attempts to discredit those reports. However, her efforts to do so are not convincing.

Both of Dr. Lumpkins' file review reports are detailed and thorough. Plaintiff attempts to discredit Dr. Lumpkins' first report by focusing on a quotation from Prudential's April 25, 2002 letter to Plaintiff's attorney. (MAB 0108). In that letter, Prudential approved Plaintiff's claim for a closed period related to her carpal tunnel condition but otherwise denied the claim noting:

> Although [Plaintiff] reported difficulties with activities of daily living, there are also indications in records that she was able to maintain the home, shop, went to the ocean, and went to an amusement park with her grandchildren where [Plaintiff] rode the bumper cars. These activities are reflective of a physical capabilities consistent with at least a sedentary level of function.

(MAB 0110).

Plaintiff contends that this statement mischaracterized her level of functionality and that this mischaracterization materially tainted Dr. Lumpkins' conclusion. This Court disagrees. The quotation was but one small piece of the puzzle reviewed by Dr. Lumpkins, and there is no indication in her report that it was a conclusive piece. Further, although Plaintiff disputes the context of her reported activities, she does not and cannot dispute a basis in the record for such activities. (MAB 0319, 0327, 0402, 0405, 0409, 0410). Further, although some of those reported activities date back to 2000 and 2001, they are consistent with the results of the 2003 surveillance. (MAB 0166-0177).

Plaintiff's second criticism of Dr. Lumpkins' reports is that she deals piecemeal with Plaintiff's various ailments rather than considering the totality of her medical situation. Again, this Court disagrees. Since Plaintiff received LTD benefits through October 31, 2003, Dr. Lumpkins' report focused on Plaintiff's impairments after that date. (MAB 0260). Dr. Lumpkins' second report focused on Lyme disease and hypogammaglobulinemia because that was the focus of Plaintiff's

January 17, 2005 "final" appeal. (MAB 0252). Dr. Lumpkins' first report, on the other hand, was much broader in scope and took Plaintiff's entire medical and claim history into consideration. (MAB 0240-0247). Dr. Lumpkins' reports provided a rational basis for Prudential's denial of Plaintiff's LTD claim. The issue is not whether this Court would have reached the same decision as Prudential but rather it is whether Prudential's actions were arbitrary and capricious. See Coleman v. Metro. Life Ins. Co., 919 F. Supp. 573, 582 (D.R.I. 1996) (in applying the arbitrary and capricious standard of review, "it is up to the administrator, not judges, to choose between reasonable alternatives"). Since Prudential has provided "reasoned support for its conclusion," Plaintiff has not established that its decision to deny LTD benefits to her was arbitrary, capricious, or an abuse of discretion. Buffonge, 426 F.3d at 30.

**Conclusion**

For the reasons stated, I recommend that Plaintiff's Motion for Summary Judgment (Document No. 16) be DENIED and Defendants' Motion for Summary Judgment (Document No. 13) be GRANTED. I further recommend that final judgment be entered in favor of Defendants. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. Fed. R. Civ. P. 72(b); Local Rule 32. Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1990).

LINCOLN D. ALMOND
United States Magistrate Judge
December 29, 2005